**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF KENTUCKY (at Frankfort)**

| | | |
|---|---|---|
| TONY RAMSEK | : | Case No. _____ |
| c/o Christopher Wiest, Esq. | | |
| 25 Town Center Blvd, STE 104 | : | |
| Crestview Hills, KY 41017 | | |
| | : | |
| AND | | |
| | : | |
| FRANK HARRIS | | |
| c/o Christopher Wiest, Esq. | : | |
| 25 Town Center Blvd, STE 104 | | |
| Crestview Hills, KY 41017 | : | |
| | | |
| AND | : | |
| | | |
| THEODORE JOSEPH ROBERTS | : | |
| c/o Christopher Wiest, Esq. | | |
| 25 Town Center Blvd, STE 104 | : | |
| Crestview Hills, KY 41017 | | |
| | : | |
| AND | | |
| | : | |
| TONY WHEATLEY | | |
| c/o Christopher Wiest, Esq. | : | |
| 25 Town Center Blvd, STE 104 | | |
| Crestview Hills, KY 41017 | : | |
| | | |
| On behalf of themselves and | : | |
| All others similarly situated | | |
| | : | |
| PLAINTIFFS | | |
| | : | |
| v. | | |
| | : | : |
| HON. ANDREW BESHEAR | | |
| 700 Capitol Avenue, Suite 100 | : | |
| Frankfort, KY 40601 | | |
| In His Official Capacity Only | : | |
| | | |
| AND | : | |
| | | |
| ERIC FRIEDLANDER | : | |
| 275 E. Main Street, 5W-A | | |
| Frankfort, KY 40621 | : | |

1

In His Official Capacity Only                :

AND                                          :

Dr. Steven Stack, M.D.                       :
275 E. Main St.
Frankfort, KY 40621                          :
In His Official Capacity Only
                                             :

      DEFENDANTS[1]

## VERIFIED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR CONSTITUTIONAL VIOLATIONS

Plaintiffs Tony Ramsek ("Tony"), Frank Harris ("Frank"), Theodore Joseph Roberts ("TJ"), and Tony Wheatley ("Wheatley") (collectively "Plaintiffs"), for their Verified Class Action Complaint *for Declaratory and Injunctive Relief* (the "Complaint"), state and allege as follows:

## INTRODUCTION

1. This action involves the deprivation of Plaintiffs' First and Fourteenth Amendment rights, by the official capacity Defendants named herein. This action involves the response actions by the official capacity Defendants herein to COVID-19 (the disease caused by the Coronavirus). Admittedly, COVID-19 presents a serious threat to public health and, equally admittedly, Defendants have a degree of discretion available to them to deal with this public health threat. Those tools, however, are not limitless. As the facts and circumstances in this Complaint reveal, Defendants have gone too far, and beyond the limits the Constitution permits.

---

[1] As required by Kentucky law, the undersigned have provided a copy of the foregoing Complaint on the Kentucky Attorney General.

2. Specifically, this Complaint addresses the Governor's mass gathering ban, applied to political protests at the Capitol, and his threats of enforcement.

3. In this country's history, and certainly in times of public panic and fear, egregious violations of fundamental rights have been permitted. *Korematsu v. United States*, 323 U.S. 214 (1944). Typically, it is only well after-the-fact that the error of this permission officially has been recognized. *Trump v. Hawaii*, 138 S.Ct. 2392 (2018).

## PARTIES

4. Plaintiff Frank Harris ("Mr. Harris") is a resident of Fayette County, Kentucky. He is a longtime Kentucky liberty activist. Mr. Harris has been, and remains, deeply critical of certain of Governor Beshear's actions in response to COVID-19, which actions he views as fundamental assaults on protected liberty interests.

5. Plaintiff Theodore Roberts ("TJ") is a recent college graduate who is a devout Christian. In addition, he holds critical opinions of certain of Governor Beshear's actions related to COVID-19, including the Governor's unnecessary prohibitions on practicing one's faith, business shutdowns, economic devastation, and a belief that the Governor is continuing the shutdown unnecessarily and unduly harshly in order to devastate Kentucky's economy for political gain in this November's general election. TJ resides in Boone County, Kentucky.

6. Plaintiff Tony Ramsek ("Mr. Ramsek") is a resident of Boone County, Kentucky. Among other of his life's vocations, Mr. Ramsek is a deacon in his church who engages in street evangelism. He firmly believes the Bible's pattern for the assembly of Christians is fulfilled by in-person attendance at church services, but not by drive-in services. He has taken time to protest the Governor's in-person church ban and, further, he is deeply concerned about the long-term economic impacts of the Governor's orders. This is particularly true with respect

3

to the impact on impoverished Kentuckians where there is the potential for a loss of hope and an increase in suicides among such persons due to the lack of religious community caused by the ban. Mr. Ramsek has ministered to, and fed the homeless and other needy people in the community, but now is prohibited from doing so under the Governor's orders.

7. Plaintiff Tony Wheatley ("Mr. Wheatley") is a resident of Mercer County, Kentucky.  Mr. Wheatley is a grassroots liberty organizer who is involved with Constitutional Kentucky, a non-partisan organization in Kentucky that helps elect candidates who pledge to, and actually adhere to, constitutional principles.  He also has protested the unconstitutional actions of Governor Beshear.

8. Defendant Hon. Andrew Beshear is the duly elected Governor of Kentucky.  He is only sued in his official capacity.

9. Defendant Eric Friedlander is the acting Secretary of the Cabinet for Health and Family Services, and is only sued in his official capacity.

10. Defendant Dr. Steven Stack, M.D. is the commissioner for the Kentucky Department of Public Health, and is only sued in his official capacity.

11. All Defendants enforce and are charged with the enforcement or administration of Kentucky's laws under KRS 39A, and KRS 220, including, among other things, the orders and actions complained of herein.

## JURISDICTION AND VENUE

12. Subject matter jurisdiction over the claims and causes of action asserted by Plaintiffs in this action is conferred on this Court pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, 28 U.S.C. §1331, 28 U.S.C. § 1343, 28 U.S.C. §§ 2201 and 2202, and other applicable law.

13. Venue in this District and division is proper pursuant to 28 U.S.C. §1391 and other applicable law, because much of the deprivations of Plaintiffs' Constitutional Rights occurred in counties within this District within Kentucky, and future deprivations of their Constitutional Rights are threatened and likely to occur in this District.

**Additional Allegations Concerning Standing**

14. Defendants are empowered, charged with, and authorized to enforce and carry out Kentucky's emergency power laws and health related laws under K.R.S. 39A and KRS Chapter 214. Moreover, Defendants actually do enforce and administer these laws and have threatened Plaintiffs with enforcement of them.

**FACTS COMMON TO ALL CLAIMS**

Background on Governor Beshear's Responses to COVID-19 to date

15. On March 6, 2020, Governor Andrew Beshear issued Executive Order 2020-215 declaring a state of emergency. Among other things, this Order declared an emergency due to COVID-19 in and for Kentucky. **See Exhibit A**, hereto.

16. Throughout March, 2020, the Governor and/or his designees issued a number of recommendations to persons and businesses that are not challenged in this action concerning COVID-19.

17. On March 16, 2020, in and in further response to COVID-19, the Governor and/or his designees limited restaurants to carry-out or pickup or delivery service only. **See Exhibit B**, hereto.

18. On March 17, 2020, and in further response to COVID-19, the Governor and/or his designees shut down certain businesses that involved public congregation, while leaving open a number of other businesses deemed "essential". **See Exhibit C**, hereto. These "essential"

businesses that were permitted to remain open included industrial manufacturing,

construction, retail, consumer goods, gas stations, and hotels.

19. On March 19, 2020, and in further response to COVID-19, the Governor and/or his designees

prohibited some, but not all, public gatherings.  **See Exhibit D**, hereto.  On the one hand, the

Order provided that "[a]ll mass gatherings are hereby prohibited."   "[m]ass gatherings"

included "any event or convening that brings together groups of individuals, including, but

not limited to, community, civic, public, leisure, faith-based, or sporting events; parades;

concerts; festivals; conventions; fundraisers; and similar activities."  The Order then

exempted a number of activities from this definition: "For the avoidance of doubt, a mass

gathering does not include normal operations at airports, bus and train stations, medical

facilities, libraries, shopping malls and centers, or other spaces where persons may be in

transit. It also does not include typical office environments, factories, or retail or grocery

stores where large numbers of people are present, but maintain appropriate social

distancing."[2]

20. On March 22, 2020, the Governor and/or his designees shut down additional "non-life

sustaining" retail establishments to in-person traffic, but left other "life sustaining" retail

open.  **See Exhibit E**, hereto.

21. On March 25, 2020, the Governor and/or his designees shut down additional businesses for

in-person work, while leaving others open.  **See Exhibit F**, hereto.[3]

22. Most of the aforementioned executive orders reference K.R.S. 39A and/or K.R.S. Chapter

214 as authority for their promulgation.

---

[2] Yet another notable exception appears to be the Governor's own daily press conference, where reporters and members of the media gather daily in a "do as I say, not as I do" scenario.
[3] The Governor has begun scaling back these orders.

23. Both of those Chapters contain criminal penalties, such as K.R.S. 39A.990, establishing as a Class A misdemeanor any violations of orders issued under that Chapter, and K.R.S. 220.990, which generally provides as a Class B misdemeanor for any violations of orders under that Chapter.  K.R.S. 39A.190 gives police officers authority to "arrest without a warrant any person violating or attempting to violate in the officer's presence any order or administrative regulation made pursuant to" KRS Chapter 39A.

24. In addition, the Governor has set up a COVID-19 reporting hotline, so that members of the public can call in violations of his orders.

<u>The Plaintiffs' Activities</u>

25. Plaintiffs reincorporate the preceding Paragraphs as if fully written herein.

26. Kentucky's Capitol has long been recognized as, and in fact is, a traditional public forum and/or a designated public forum which has been open to citizen protests.  Indeed, on just about any controversial topic involving Kentucky's government, protesters can be found at the Kentucky Capitol exercising their First Amendment rights to petition, to assemble, and to speak.

27. These protests at and outside the Capitol have occurred across administrations, involved numerous issues, and have crossed political divides.[4]  Even Kentucky's current Governor

---

[4] https://www.courier-journal.com/story/news/education/2018/04/13/kentucky-teachers-rally-capitol-after-school-closures/508812002/ (last visited 5/4/2020); https://www.wdrb.com/in-depth/we-re-scared-hundreds-of-anxious-kentucky-teachers-protest-at/article_a4deca5c-410b-11e9-9f53-9b96c2e22d34.html (last visited 5/4/2020);  https://www.courier-journal.com/story/news/politics/2020/01/31/kentucky-gun-rights-groups-rally-2nd-amendment-capitol/4602922002/ (last visited 5/4/2020); nation (last visited 5/4/2020); https://www.kentucky.com/news/politics-government/article207665689.html (last visited 5/4/2020);

has participated in some of these well-established, First Amendment-protected, protest activities against his predecessor.[5]

28. Significantly, and in light of the ongoing Covid-19 situation, it appears that peaceful protest is one of the few manners of redress of grievances presently available to the average Kentuckian: Kentucky courts have severely curtailed operations,[6] and, even more significantly, the ability to act through the people's representatives, the Kentucky General Assembly, is curtained due to their adjournment for the year.[7] Further, the Governor has shut down the Capitol Building itself to in-person traffic.

29. Like on any controversial topic, there is strong opposition to the Governor's COVID orders (collectively the orders at Exhibits A through F, and many more). The shutdown of thousands of businesses has wreaked a significant economic toll on the Commonwealth, including record unemployment[8] and other potentially long term devastating economic impacts.[9] There is concern this may cost more lives than COVID-19 itself.[10] While this case does not seek to decide those issues or resolve the debate over them, it does seek to redress the Governor's unconstitutional restrictions in response to the protests that have ensued.

---

[5] https://www.courier-journal.com/videos/news/education/2019/02/28/video-andy-beshear-speaks-teachers-during-february-2019-sickout/3014741002/ (last visited 5/4/2020).
[6] https://kycourts.gov/courts/supreme/Rules_Procedures/202028.pdf (last visited 5/7/2020).
[7] https://apps.legislature.ky.gov/record/20rs/record.html (last visited 5/7/2020).
[8] https://www.courier-journal.com/story/news/2020/04/16/coronavirus-kentucky-116-k-new-residents-file-unemployment/2990017001/ (last visited 5/4/2020)
[9] https://www.kentucky.com/news/coronavirus/article242316551.html (last visited 5/4/2020).
[10] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1448606/ (last visited 5/4/2020); https://nypost.com/2020/04/14/we-must-count-the-deaths-from-shutdowns-as-well-as-from-coronavirus/ (last visited 5/4/2020).

30. Most significantly, on Wednesday April 15, 2020, approximately 100 opponents of the unconstitutional shutdown organized a peaceful "re-open Kentucky" protest at the Capitol.[11] In doing so, they interrupted the Governor's own daily mass gathering, his daily press conference.

31. The following day, and to prevent further inconvenience to the Governor's daily mass gathering,[12] barriers were erected with threats of criminal prosecution, caution tape was installed, and armed state police officers were posted on the roof of the Capitol. A true and accurate photograph of such a barrier is below, with a sign that reads "Pursuant to 200 K.A.R. 3:020, the Kentucky State Police has deemed this area a restricted zone. No one is permitted past this point. Failure to adhere to this Regulation may result in Criminal Penalty under K.R.S. 511.070:"



---

[11] https://www.courier-journal.com/story/news/2020/04/17/coronavirus-kentucky-paul-attacks-beshear-protest-restrictions/5151592002/ (last visited 5/4/2020).
[12] https://www.wlky.com/article/ksp-stations-at-capitol-now-offering-drive-thru-protesting-option-covid19-coronavirus/32176617 (last visited 5/4/2020). https://www.courier-journal.com/story/news/politics/2020/04/16/kentuckians-motivated-frustration-freedom-plan-demonstration-capitol/5144655002/ (last visited 5/4/2020).

32. In order to stop drive-in protesters from driving around the Capitol streets to engage in peaceful protest, the Kentucky State Police parked their cruisers on the roads adjacent to the Capitol to block and prevent such a protest, particularly during the Governor's daily mass gathering with the press.

33. Not stopping at these measures, and also acting at the behest of Governor Beshear, Dr. Steven Stack created a zone for protesters (hereinafter the "Restricted Speech Zone") on the "top floor of the Capitol parking garage."  Protestors are forced to "remain in their vehicles." A true and accurate copy of his announcement of this is contained below:

## Statement from State Health Commissioner Regarding Mass Gatherings at the Capitol

"The coronavirus is deadly and it spreads through mass gatherings at an alarming rate. In Kentucky alone, we know of dozens of cases spread through mass gatherings and at least six deaths. Because we have a duty to protect Kentuckians' lives and prevent the spread of COVID-19, mass gatherings should not occur anywhere in the state, including at the Capitol or on its grounds. I am saddened that COVID-19 has so severely disrupted our society and am deeply respectful of our right to gather to express different opinions. In an attempt to balance public safety with public expression, I have asked the Kentucky State Police to provide an alternative option that will allow people to demonstrate safely while practicing social distancing on Capitol grounds. A drive-in and drive-through option will be available on the top floor of the Capitol parking garage. Participants must remain in their vehicles, in designated parking areas and follow Centers for Disease Control and Prevention (CDC) recommendations. These options allow people to use their voices and be heard while protecting the public health. In these historic times, the grim reality is that those who do not follow Kentucky Department for Public Health, White House and CDC guidance will spread the virus and place the lives of others at risk."

—STEVEN STACK, M.D., *Commissioner*
Kentucky Department for Public Health

  

34. A true and accurate copy of the aerial view of the Capitol parking garage and the top floor Restricted Speech Zone, is contained below:



35. The Restricted Speech Zone has space for approximately 300 vehicles.  The Restricted

Speech Zone is out of sight from the Capitol itself and is approximately one-half mile away.

Not surprisingly, any signs on vehicles parked within the Restricted Speech Zone, or

displayed by the occupants, are not able to be seen from the Capitol.

36.  Because of the requirement to remain in vehicles, protestors cannot be heard from the

Restricted Speech Zone.  In short, the Restricted Speech Zone is nothing short of an

unconstitutional effort to silence dissent and push inconvenient, but peaceful, protesters out

of sight.

37. On April 25, 2020, peaceful protesters again went to the Capitol grounds to protest the Governor's COVID-19 orders.  Thankfully, they were not arrested.[13]  Many, but not all, of these peaceful protestors wore masks and practiced social distancing.

38. In response, Governor Beshear denounced them and their "illegal" activities at his next daily mass gathering with the press.

39. On May 2, 2020, a far larger peaceful protest was planned and carried out by the Re-Open Kentucky protestors.[14]  It was well-attended, as approximately 1700 peaceful protesters appeared.  Several pastors spoke, along with two state legislators.  Notwithstanding an agenda-driven media account to the contrary, the event was designed to be family friendly and peaceful.  With the exception of a few individuals, the event was a patriotic rally complete with speeches urging the re-opening of the Commonwealth.

40. Plaintiffs were among those in attendance.

41. None of the Plaintiffs were permitted or able to conduct this peaceful protest in a socially distanced manner by driving around the Capitol, because these streets were closed by Kentucky State Troopers.

42. Furthermore, Plaintiff Ramsek attempted to utilize the Restricted Speech Zone, but Kentucky State Police blocked the entrance to the garage, demonstrating that the Restricted Speech Zone is not, in fact, a location open for peaceful protesting.

---

[13] https://www.wkyt.com/content/news/WATCH-LIVE-Gov-Andy-Beshear-gives-Saturday-briefing-on-COVID-19-569950311.html (last visited 5/4/2020).

[14] https://www.wdrb.com/news/coronavirus/freedom-rally-protesters-gather-at-capitol-to-call-for-kentuckys-businesses-to-reopen-from-pandemic/article_46579820-8cd1-11ea-ad6e-cf2275ba3d05.html (last visited 5/4/2020);
https://www.kentucky.com/news/state/article242436221.html (last visited 5/4/2020)

43. The Kentucky State Police also blocked the entire backside of the Capitol and area immediately adjacent to it by roping it off.

44. The Kentucky National Guard was likewise posted in those areas near the Governor's mansion, further packing the crowd in.

45. Finally, the State Police blocked the entire perimeter of the peaceful protest; officers were taking notes, speaking into microphones, and wearing body cameras sufficient to capture the protestors identities for subsequent enforcement.  Police sirens also went off in proximity to the peaceful protest.

46. In response to this protest, on May 3, 2020, Governor Beshear was asked by a reporter whether these peaceful protesters should "expect enforcement," including whether state police (who were present) had been "taking down license plate numbers" and whether such persons attending would receive notices or citations.  Governor Beshear's response was "we'll see."[15]

47. As a consequence of the foregoing, each of the Plaintiffs actually and reasonably expects enforcement action to be taken against them, and has had credible threats of enforcement against them.

48. Among other things, in terms of the credible threat of enforcement, the Governor has also had state police place these notices at other mass gatherings, i.e. churches:

---

[15] https://www.youtube.com/watch?v=Uv-1XkU5viA (last visited 5/4/2020); the timestamp for these statements are from the 56:00 mark to 57:22.



49. Plaintiffs desire to attend, and possibly organize, other protests at the Capitol. In light of the Governor's mass gathering ban, Plaintiffs reasonably fear prosecution if they should do so.

50. Specifically, Plaintiffs Ramsek, Harris, Wheatley, and Roberts are currently involved in planning another Re-Open Kentucky Protest for May 23, 2020 ("May 23 Protest"). This date was chosen with care: it is the Saturday that immediately precedes Memorial Day, which commemorates the sacrifices of American Soldiers, Sailors, Airmen, and Marines who paid the ultimate sacrifice to defend the Constitution. They believe that this is particularly fitting because they also believe the Governor is violating numerous provisions of the Constitution in disregard of these heroic sacrifices.

51. They have extended invitations to Kentucky legislators at both the federal and state level, or are in the process of doing so, for the May 23 Protest. They have extended invitations to other Kentucky executive department officials, or are in the process of doing so. They anticipate between 2,000 and 5,000 protestors to attend.

14

52. Plaintiffs, and others, reasonably fear prosecution, arrest, and other forms of enforcement should they attend or continue to organize the May 23 Protest.  Several legislators have indicated to Plaintiffs that Governor Beshear has informed the state legislators that he will pursue action against them in the form of legislative ethics complaints or criminal prosecution if they should attend.  At least one member of Kentucky's federal delegation has expressed an interest in speaking, but is concerned about the Governor's threats.

53. The mass gathering ban and other executive orders issued by the Governor do not provide a process by which the individual Kentuckian will be notified if they are charged or accused of a violation of the orders, do not provide any mechanism to challenge or appeal any such determinations, and do not provide any process at all to challenge the facts and circumstances of such orders.

54. The mass gathering ban and other executive orders issued by the Governor do not provide any right or opportunity for the individual Kentuckian to be heard if the individual is ordered to be quarantined, or detained, or otherwise punished for violating the order.  They also do not provide the individual Kentuckian with a right to be heard by a fair and independent tribunal if the citizen is ordered to be quarantined, or detained, or otherwise punished for violating the orders.  The orders provide no right to appeal a quarantine, detention, or punishment or to appeal an order to quarantine pursuant to the orders.

55. The orders do not provide Kentuckians with the right to present evidence, the right to know the evidence opposing them, the right to cross-examine, the opportunity for counsel, or the right to have a record.

56. During the COVID-19 outbreak, Governor Beshear and the other Defendants have actively enforced the Governor's Executive Orders, including ordering sheriff's deputies to forcibly quarantine at least one Kentuckian.

57. Upon information and belief, multiple Kentuckians in Louisville have been ordered to wear ankle monitors to ensure their government-imposed quarantine, even though they have not tested positive for COVID-19.

58. On the same day that the Governor instituted the Travel Ban, he also created the "COVID-19 Reporting Hotline" and requested that Kentuckians call it "for complaints about non-compliance with coronavirus mandates."

## The Constitutional Rights Violated by Defendants

## COUNT I: Defendants have Violated the First Amendment (42 USC 1983)

### 1.  Defendants have violated the First Amendment Right to Free Speech

59. The First Amendment guaranties, among other things, that government may make no law "abridging the freedom of speech."  U.S. Const., Amend. I.  It has been incorporated against the states.  *Gitlow v. New York*, 268 U.S. 652 (1925).

60. The Supreme Court classifies three types of speech forums: the traditional public forum, the designated public forum, and the nonpublic forum. Traditional public forums are places that by long tradition have been open to public assembly and debate. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" (*quoting Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515, 59 S. Ct. 954 (1939))). In these traditional public forums, the government's right to

16

"limit expressive activity [is] sharply circumscribed." *Id.* A designated public forum is public property, not constituting a traditional public forum, which the government has intentionally opened to the public for expressive activity. *Id.*

61. State Capitol buildings, if open to protests for long periods of history, such as is the case in Kentucky, are public forums. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 766 (1995) ("Capitol Square is a genuinely public forum, is known to be a public forum, and has been widely used as a public forum for many, many years.").

62. Supreme Court cases make clear that in public forums, government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are (i) not based on content (content-neutral); (ii) narrowly tailored to serve a significant governmental interest; and (iii) leave open ample alternative channels for communication of the information. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

63. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). "This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys." *Id.* "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* "Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* "Because strict scrutiny applies either when a law is content based on its face, or when the purpose and justification for the law are content based, a court must evaluate each

question before it concludes that the law is content neutral and thus subject to a lower level

of scrutiny." *Id.* at 2228. "Thus, a speech regulation targeted at specific subject matter is

content based even if it does not discriminate among viewpoints within that subject matter.

Ibid. For example, a law banning the use of sound trucks for political speech—and only

political speech—would be a content-based regulation, even if it imposed no limits on the

political viewpoints that could be expressed." *Id.* at 2229.

64. Because "[s]peech restrictions based on the identity of the speaker are all too often simply a

means to control content," *Citizens United v. Federal Election Comm'n*, 558 U. S. 310, 340

(2010), the Supreme Court has insisted that "laws favoring some speakers over others

demand strict scrutiny when the legislature's speaker preference reflects a content

preference," Turner Broad. Sys. v. FCC, 512 U.S. 622, 658 (1994). "Thus, a law limiting the

content of newspapers, but only newspapers, could not evade strict scrutiny simply because it

could be characterized as speaker based." *Reed*, 135 S. Ct. 2218, 2230. "Likewise, a

content-based law that restricted the political speech of all corporations would not become

content neutral just because it singled out corporations as a class of speakers." *Id.*

"Characterizing a distinction as speaker based is only the beginning—not the end—of the

inquiry." *Id.* at 2230-2231.

65. Turning to the Governor's mass gathering ban as applied to political protests, the order,

facially, is not content neutral: it permits mass gatherings in contexts other than protests,

including "airports, bus and train stations, medical facilities, libraries, shopping malls and

centers, or other spaces where persons may be in transit." And also permits such gatherings

in "typical office environments, factories, or retail or grocery stores where large numbers of

people are present, but maintain appropriate social distancing." Or, as the Sixth Circuit

recently suggested, "[i]f the problem is numbers, and risks that grow with greater numbers, then there is a straightforward remedy: limit the number of people who can attend a service at one time." *Maryville Baptist Church, Inc. v. Beshear*, 2020 U.S. App. LEXIS 14213 (6th Cir. 2020).

66. The order, which permits mass gatherings in some contexts but not others, including protests, is a subtle and insidious discrimination based on the class, purpose, and identity of the speaker. If the Governor wanted to give a press briefing at the Capitol (a mass gathering), which is arguably an "office environment," it is permitted. If a legislator wanted to give a press briefing, or another government official, the same analysis applies. But, if a group of protesters wanted to gather to criticize certain unconstitutional actions of the Governor, it is not permitted.

67. Beyond the lack of content-neutrality, however, the order is not "narrowly tailored to serve a significant governmental interest." It fails to define the size of the gathering that is permitted or allowed; it does not allow mass gathering protests with social distancing that has been safely (and effectively) permitted elsewhere;[16] in both enforcement and on its face, it does not permit persons in cars to drive around the Capitol in protest (which these protesters also have attempted, but which has since been blocked by the Kentucky State Police), and which poses a minimal risk in terms of the virus.[17]

68. That turns to the final factor: leaving open ample alternative channels for communication of the information. *Clark*, 468 U.S. 288, 293; *Ward*, 491 U.S. 781, 791. The ban utterly fails

---

[16] https://www.theatlantic.com/international/archive/2020/04/protest-demonstration-pandemic-coronavirus-covid19/610381/ (last visited 5/8/2020).

[17] https://www.wkyt.com/content/news/Caravan-style-protest-descends-on-Kentucky-capitol-569727791.html (last visited 5/8/2020).

on this score.  Where a government enactment forecloses an entire medium of public expression across the landscape of a particular community or setting, the prong is not met. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 525-27 (1981) (Brennan, J., concurring). The Supreme Court has been particularly hesitant to close off channels of communication which provide individuals with inexpensive means of disseminating core political messages. *See, e.g., City of Ladue v. Gilleo*, 512 U.S. 43, 54-56 (1994) (ordinance banning residential signs almost completely foreclosed "a venerable means of communication that is both unique and important" and for which there is no adequate substitute, particularly for persons of modest means"); *Martin v. City of Struthers*, 319 U.S. 141, 146 (1943) ("Door to door distribution of circulars is essential to the poorly financed causes of little people.").

69. The Supreme Court has stressed the importance of providing access "within the forum in question." *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981). "One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno v. ACLU*, 521 U.S. 844, 880 (1997).

70. In-person protests are a time-honored, venerable means of expressing dissent in our constitutional republic.  Limiting such gatherings to the Governor's Restricted Speech Zone is no substitute. *United States v. Grace*, 461 U.S. 171 (1983).  The Restricted Speech Zone is particularly problematic in this regard: it is out of sight, far away, out of hearing range, and no one can step out of their vehicles with a bullhorn to try to be heard.  What is more, it is illusory, as the testimony of Mr. Ramsek indicates: it is not, in fact, open for protests because

20

Kentucky State Troopers blocked access to it. This is a far cry from the required ample alternative channels for communication.

71. The mass gathering ban, as applied to political protests, and coupled with the insulting Restricted Speech Zone, violates the First Amendment's guaranty of Free Speech.

**2.  Defendants have violated the First Amendment Right to Assemble and Petition**

72. The First Amendment also guaranties the right "of the people peaceably to assemble." This guaranty has also been incorporated against the states. *DeJonge v. Oregon*, 299 U.S. 353 (1937).

73. The right to petition the government for redress of grievances, and to conduct peaceful protest at a state capitol, has been embedded at the very core of First Amendment protection, and has a long and storied pedigree, from women's suffrage to the civil rights movement of the 1960s. *Edwards v. South Carolina*, 372 U.S. 229 (1963); *Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969); *Gregory v. Chicago*, 394 U.S. 111 (1969).

74. These rights, being fundamental rights, trigger strict scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

75. It goes without saying that the blocking of public streets is among the fundamental rights that the Governor's orders prohibit. *Shuttlesworth*, 394 U.S. 147 (right to protest in public streets is a fundamental right).

76. Assuming the Defendants can demonstrate a compelling governmental interest, i.e. the prevention of COVID-19, the order is still not narrowly tailored.

77. It fails to define the size of the gathering that is permitted or allowed; it does not allow mass gathering protests with social distancing that has been safely (and effectively) permitted

elsewhere;[18] in both enforcement and on its face; and it does not permit persons in cars to drive around the Capitol in protest (which these protesters also have attempted, but which has been blocked by the Kentucky State Police), which poses no risk whatsoever in terms of the virus.[19]

78. Indeed, in many ways, Governor Beshear's actions make it more, rather than less, likely COVID-19 will spread.   Blocking the Restricted Speech Zone and public streets for vehicle-based protests, for instance, denies protesters outlets in which they can express their disapproval in a reasonable and safe manner.   Failing to outline ways protests can safely occur at the Capitol leaves protesters to their own devices.

79. Permitting mass gathering protests with social distancing that has been safely (and effectively) permitted elsewhere is yet another example.[20]

80. The Governor's mass gathering ban is unconstitutional as applied to First Amendment activities.

### 3.  Defendants have violated the First Amendment Because the Mass Gathering Order is Unconstitutionally Vague

81. A law is vague if it "fails to provide fair notice to those to whom it is directed." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991) (internal quotation marks omitted). To determine whether a law provides such notice, the test in most contexts is whether a law "give[s] the person of ordinary intelligence a reasonable opportunity to know what is

---

[18] https://www.theatlantic.com/international/archive/2020/04/protest-demonstration-pandemic-coronavirus-covid19/610381/ (last visited 5/8/2020).
[19] https://www.wkyt.com/content/news/Caravan-style-protest-descends-on-Kentucky-capitol-569727791.html (last visited 5/8/2020).
[20] https://www.theatlantic.com/international/archive/2020/04/protest-demonstration-pandemic-coronavirus-covid19/610381/ (last visited 5/8/2020).

prohibited." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

82. In the free-speech context, however, the "standards of permissible statutory vagueness" are even stricter. *NAACP v. Button*, 371 U.S. 415, 433 (1963). The freedom of speech is "delicate and vulnerable, as well as supremely precious in our society . . . [and] the threat of sanctions may deter [speech] almost as potently as the actual application of sanctions." *Id.*

83. A content-based regulation is therefore not narrowly tailored—*i.e.*, it is unconstitutional—if it is too vague. *See Hill*, 482 U.S. 451. "The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-872 (1997).

84. Moreover, vague laws give authorities discretion to enforce the law against one speaker but not others, thus creating the "risk of discriminatory enforcement." *Id.* at 872. "Such discretion is particularly repugnant given the eternal temptation … to arrest the speaker rather than to correct the conditions about which he complains." *Hill*, 482 U.S. at 465 n.15. In short, "First Amendment freedoms need breathing space to survive," and thus the "government may regulate in the [free-speech] area only with narrow specificity." *Id* at 433.

85. The mass gathering ban, which purports to ban all mass gatherings, but then carves out exceptions, is the epitome of this unconstitutional vagueness.  Is a particular mass gathering banned?  We aren't sure.  The Governor's daily press conference?  Apparently not, as maybe that is a "typical office setting".  A protest outside the Capitol?  Maybe.

86. The mass gathering order is unconstitutionally vague.

## COUNT II:    Defendants have violated procedural due process

87. "[T]here can be no doubt that at a minimum [procedural due process] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).

88. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955).

89. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that "procedural due process rules are shaped by the risk of error inherent in the truth-finding process...." *Carey v. Piphus*, 435 U.S. 247, 259 (1978) (*citing Mathews v. Eldridge*, 424 U.S. 319, 344 (1976)).

90. By issuing and enforcing the mass gathering orders, without any process to appeal a determination or an order to quarantine, Governor Beshear and the other Defendants herein are depriving and will continue to deprive Plaintiffs and other similarly situated Kentuckians of the right to procedural due process secured by the Fifth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983, thereby causing them harm. Plaintiffs are therefore entitled to a declaration of the unconstitutionality of the mass gathering order, both on its face and as applied, and injunctive relief prohibiting the enforcement of the mass gathering order.

## Class Allegations

91. Plaintiffs reincorporate the preceding Paragraphs as if fully written herein.

24

92. The actions and violations herein complained of affect millions of Kentuckians.

93. Pursuant to FRCP 23(a), (i) the class is so numerous that joinder of all members is impracticable (with millions of potential Plaintiffs); (ii) there are questions of law or fact common to the class; (iii) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (iv) the representative parties will fairly and adequately protect the interests of the class.

94. Pursuant to FRCP 23(b): (i) prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; and (ii) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

95. Plaintiffs seek a Plaintiff class, consisting of those persons who desire to violate the prohibitions on gathering for mass gatherings, who would practice appropriate social distancing if permitted to do so.

<u>Injunctive Relief</u>

96. Plaintiffs have and continue to have their fundamental constitutional rights violated by these official capacity Defendants, each of whom is personally involved with the enforcement and/or threatened enforcement of the challenged orders.  Plaintiffs will be irreparably harmed

if injunctive relief is not issued.  Further, the public interest is served by the vindication of constitutional rights, and the weighing of harms warrants issuing injunctive relief.

<u>Generally</u>

97. Defendants abused the authority of their respective offices and, while acting under color of law and with knowledge of Plaintiffs' established rights, used their offices to violate Plaintiffs' Constitutional rights, privileges, or immunities secured by the Constitution and laws.

98. Thus, under 42 U.S.C 1983, Plaintiffs seek declaratory relief and injunctive relief.  Pursuant to 42 U.S.C. 1988, Plaintiffs further seek their reasonable attorney fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as prayed for, including:

A.  That this Court issue a declaration that the challenged orders are unconstitutional.

B.  That this Court enter permanent injunctive relief to prohibit enforcement of the challenged orders.

C.  Certify a class as provided in the Complaint

D.  That Plaintiffs be awarded their costs in this action, including reasonable attorney fees under 42 U.S.C. § 1988; and

E.  Such other relief as this Court shall deem just and proper.

Respectfully submitted,


/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
859/486-6850 (v)
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com


/s/Thomas Bruns_____
Thomas Bruns (KBA 84985)
4750 Ashwood Drive, STE 200
Cincinnati, OH 45241
tbruns@bcvalaw.com
513-312-9890

/s/Robert A. Winter, Jr._____
Robert A. Winter, Jr. (KBA #78230)
P.O. Box 175883
Fort Mitchell, KY 41017-5883
(859) 250-3337
robertawinterjr@gmail.com

**Attorneys for Plaintiffs**

<u>VERIFICATION</u>

I, Anthony Ramsek, pursuant to 28 U.S.C. 1746, declare under penalty of perjury that I have reviewed the foregoing Complaint, that I am competent to testify in this matter, that the facts contained therein are true and correct, and are based information personally known and observed by me.

Executed on <u>May 6th, 2020</u>

Anthony Ramsek

## VERIFICATION

I, Frank Harris, pursuant to 28 U.S.C. 1746, declare under penalty of perjury that I have reviewed the foregoing Complaint, that I am competent to testify in this matter, that the facts contained therein are true and correct, and are based information personally known and observed by me.


Executed on ___MAY 4 2020___.

_Frank Harris_

Frank Harris

<u>VERIFICATION</u>

I, Theodore Joseph Roberts, pursuant to 28 U.S.C. 1746, declare under penalty of perjury that I have reviewed the foregoing Complaint, that I am competent to testify in this matter, that the facts contained therein are true and correct, and are based information personally known and observed by me.

Executed on _____5/4/2020_____.

_____                          _____
Theodore Joseph Roberts

## VERIFICATION

I, Tony Wheatley, pursuant to 28 U.S.C. 1746, declare under penalty of perjury that I have reviewed the foregoing Complaint, that I am competent to testify in this matter, that the facts contained therein are true and correct, and are based information personally known and observed by me.

Executed on _6th of May 2020_

_Tony Wheatley_
Tony Wheatley