UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| TONY RAMSEK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil No. 3:20-cv-00036-GFVT |
| | ) | |
| v. | ) | |
| | ) | **OPINION** |
| ANDREW BESHEAR, in his Official | ) | **&** |
| Capacity as Governor of Kentucky, *et al.*, | ) | **ORDER** |
| | ) | |
| Defendants. | | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This is hard. Our elected leaders struggle every day with how to govern in the face of a new virus. That virus, COVID-19, does not look exactly like anything we have seen before. What we "know" changes by the day and even the hour. All while lives are lost and disrupted. Disagreement about the constitutionality of government actions is inevitable.

But federal courts do not have the power to opine on every constitutional tension. For important reasons related to the separation of governmental powers, federal courts are limited to deciding "cases and controversies". As explained below, this case presents a constitutional question but not one the Court has the power to decide. Simply put, a violation of the executive branch order is not linked to any enforcement action before, during, or after the planned protest. The Governor, through counsel, has expressly disavowed any such action. For that reason, Plaintiffs' Emergency Motion for Preliminary Injunction will be **DENIED**.

**I**

Plaintiffs consist of four residents of Kentucky who are deeply concerned about Governor Beshears's actions in response to COVID-19 and desire to express their views through

protesting. [R. 6-1 at 1–2.] However, Plaintiffs stress that the Mass Gatherings Order does not explicitly exclude protests as a type of mass gathering that is allowed. *Id*. at 4. Plaintiffs filed their Complaint on May 10, 2020 and Motion for Temporary Restraining Order (TRO) just two days later. [R. 1; R. 6.] On May 14, the Court held a telephonic hearing in regard to the TRO where parties agreed that it would be beneficial to allow expedited briefing. Thus, the Court denied the TRO and allowed for expedited briefing for the Motion for Preliminary Injunction. [R. 10.]

As already stated in the Court's Order denying the Motion for a Temporary Restraining Order, for the past several months, the world has been collectively fighting against a global pandemic. To curb the spread of the coronavirus in the Commonwealth of Kentucky, Governor Andrew Beshear has issued a series of executive orders limiting social interaction between Kentuckians. Non-essential businesses were temporarily closed, restaurants are relegated to take-out only, and citizens have been asked to practice social distancing. On March 19, 2020, as part of broader efforts to "flatten the curve,"[1] acting Secretary of the Cabinet for Health and Family Services Eric Friedlander issued an order prohibiting "mass gatherings." [R. 1-4.] Per Secretary Friedlander's Order, mass gatherings include "any event or convening that brings together groups of individuals, including, but not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities." *Id.* Some activities which necessarily involve large groups of individuals were

---

[1] The term "flatten the curve" refers to slowing the spread of the coronavirus through the population. The goal is to "reduce[] the number of cases that are active at any given time, which in turn gives doctors, hospitals, police, schools, and vaccine-manufacturers time to respond, without becoming overwhelmed." Siobhan Roberts, *Flattening the Coronavirus Curve*, The New York Times, https://www.nytimes.com/article/flatten-curve-coronavirus.html. The result is that, when plotted on a line graph, the rate of infection appears as a flattened curve rather than a steep peak.

excluded. "[A]irports, bus and train stations, medical facilities, libraries, shopping malls and centers, or other spaces where persons may be in transit" were not included within the definition of "mass gathering," nor were "typical office environments, factories, or retail or grocery stores[.]" *Id.* As Plaintiffs emphasize, protests are not included in this list of exemptions. [R. 6-1 at 4.]²

On April 15, 2020, approximately 100 individuals organized a protest at the State Capitol during the Governor's press conference. [R. 1 at ¶ 30.] Concerned about the economy of Kentucky, protestors expressed their opposition to the restrictions the Governor has put in place during the coronavirus pandemic. *Id.* In response, Governor Beshear took steps to minimize the impact of the protests during his daily press conference. *Id.* at ¶ 31. The Kentucky State Police (KSP) restricted the public's access to the area on the southeast side of the Capitol Building where the Governor's briefings take place by placing saw-horse barriers on the patio of the Capitol and by encircling the lawn outside the Governor's office suite with yellow tape. *Id.* A sign attached to the barrier states, "Pursuant to 200 K.A.R. 3:020, the Kentucky State Police has deemed this area a restricted zone. No one is permitted past this point. Failure to adhere to this Regulation may result in Criminal Penalty under K.R.S. 511.070." *Id.*

Further measures were taken by the State Health Commissioner, Dr. Steven Stack. *Id.* at ¶ 33. He created an alternative option for people to protest on Capitol grounds, consisting of a drive-in and drive-through option that would be available to protestors on the top floor of the Capitol parking garage. *Id.* However, "participants must remain in their vehicles, in designated

---

² On May 9, 2020, Secretary Friedlander, acting on behalf of the Governor, issued an Order of the Cabinet for Health and Family Services amending the Mass Gatherings Order. [*See* R. 19 at 3 n. 4.] That amendment acted solely to exempt in-person services of faith-based organizations from the mass gatherings prohibition. Protests and similar gatherings remain prohibited.

parking areas and follow Centers for Disease Control and Prevention (CDC) recommendations." *Id*. Dr. Stack stated that "these options allow people to use their voices and be heard while protecting the public health." *Id*. For Plaintiffs, this alternative is not good enough. Plaintiffs complain that the designated area only has space for approximately 300 vehicles and is too far away from the Capitol to be visible or even heard. *Id*. at ¶ 35.

On April 25, despite these restrictions, protestors gathered at the Capitol, but no criminal repercussions were taken. *Id*. at ¶ 37. On May 2, a much larger protest took place at the Capitol, consisting of about 1,700 protestors. *Id*. at ¶ 26. Plaintiffs, who attended the rally, allege that the KSP blocked streets surrounding the Capitol to prevent drive-thru style protesting, and eventually blocked off the entire perimeter of the protest. *Id*. at ¶¶ 41, 45. Plaintiff Ramsek complains that he attempted to utilize the designated zone, but police had blocked the entrance of the garage. *Id*. at ¶ 42. These actions by law enforcement resulted in "packing in" the crowd of hundreds. *Id*. at ¶ 44. While Plaintiffs do not claim anyone who attended the protests have been charged or cited for violating the mass gathering ban, they fear that they could be. *Id*. at ¶ 47. On May 3 at the Governor's daily press conference, a reporter asked if protestors should "expect enforcement." *Id*. at ¶ 46. The Governor replied, "We'll see." *Id*. As a result of this comment, Plaintiffs "expect enforcement action to be taken against them." *Id*. at ¶ 47.

Defendants point out with respect to the previous protests, neither Plaintiffs nor anyone else obtained approval of an application to hold an event on Capitol grounds pursuant to 200 KAR 3:020. [R. 19 at 7.] Therefore, any action regulating where people could protest at the Capitol were pursuant to time, place, or manner restrictions of 200 KAR 3:020, not the Mass Gatherings Order. *Id*. The regulation authorizes the KSP and others to "place limitations on the area in which an event may be conducted, or direct the clearing of an area or separation of

4

groups, in order to ensure compliance with applicable health and safety standards, to maintain public order, and to ensure that normal public business may be conducted." 200 KAR 3:020 Section 3(4)(b).

Following the TRO hearing, Plaintiff Ramsek submitted an application to hold an event on the Capitol grounds on May 23. [R. 19 at 8.] After reviewing the application, Defendants tried to negotiate with Plaintiffs in regard to the restrictions protestors would need to follow if the permit is granted. Protestors would have access to the upper or top level of the parking structure next to the Capitol Annex Building, the parking lots behind the Capitol Annex Building, as well as the parking lot next to the Capitol. *Id*. The public thoroughfare that loops around the Capitol would also be accessible by any vehicle on May 23, so long as no vehicle blocks ingress and egress for emergency vehicles and vehicles do not prevent public business from being conducted. *Id*. Individuals would be required to engage in social distancing and hygiene measures recommended by the CDC and public health officials. *Id*. Parties have yet to reach an agreement on these matters.

Nonetheless, Plaintiffs desire to attend and organize future protests at the Capitol. [R. 1 at ¶ 49.] As noted, Plaintiffs Harris, Wheatley, and Roberts are involved in planning an upcoming protest at the Capitol on May 23, 2020. But in light of the Governor's mass gathering ban, they fear prosecution, arrest, and other forms of enforcement as a result. *Id*. at ¶ 50. For this reason, Plaintiffs argue the foregoing Order violates their First Amendment rights to freedom of speech, assembly, and petition. Plaintiffs argue they are likely to succeed on the merits of their claims because the order is not narrowly tailored to serve the public health interest.

Defendants dispute this characterization. The Court held a hearing this morning, where counsel for the Plaintiffs and Governor Beshear participated. Defendants argued that the

Plaintiffs lack standing in this matter because they cannot demonstrate a "sufficiently imminent" injury. [R. 19 at 10.] Specifically, Defendants emphasize that the Governor has never refused to disavow enforcement of the Mass Gatherings Order. *Id.* In fact, the Governor has not intervened to prevent protests in the past or in the future on Capitol grounds and has expressly disavowed enforcement of the Mass Gatherings Order as it pertains to protests, including the upcoming May 23 protest. *Id.* Plaintiffs seek a declaration that the Mass Gatherings Order is unconstitutional as applied to protests on the Capitol grounds, along with a permanent injunction enjoining enforcement of the Mass Gatherings Order. [R. 1 at 26.] Preliminarily, they seek an injunction to prevent enforcement of the Mass Gatherings Order with respect to their attendance and organization of the May 23 event. [R. 6.]

## II

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (finding that issuance of a preliminary injunction "involv[es] the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it")). To issue a preliminary injunction, the Court must consider: 1) whether the movant has shown a strong likelihood of success on the merits; 2) whether the movant will suffer irreparable harm if the injunction is not issued; 3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing the injunction. *Overstreet,* 305 F.3d at 573 (citations omitted).

A court need not consider all of the factors if it is clear that there is no likelihood of

success on the merits.  *See Amoco Protection Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").  The Court of Appeals clarified that, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.2012)).  However, even if the plaintiff is unable "to show a strong or substantial probability of ultimate success on the merits" an injunction can be issued when the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

### A

Standing is a threshold inquiry in every federal case which may not be waived by the parties.  *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987).  "To satisfy the 'case' or 'controversy requirement' of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) (citations omitted).  Plaintiffs' injury-in-fact must be both particularized and concrete.  *Spokeo v. Robins*, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–181, 120 S. Ct. 693, 145 L.

Ed. 2d 610 (2000)). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). Further, a "concrete" injury is a *de facto* injury that actually exists. *Id.* Finally, "a plaintiff must also establish, as a prudential matter, that he or she is the proper proponent of the rights on which the action is based." *Haskell v. Washington Twp.*, 864 F.2d 1266, 1275 (6th Cir. 1988) (citations omitted).

**1**

The determinative question at this preliminary stage is "whether the movant has shown a strong likelihood of success on the merits." *Overstreet,* 305 F.3d at 573. An essential part of establishing a likelihood of success on the merits is establishing standing to sue. This is so because an "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing." *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 260 n. 5 (6th Cir. 2018) (quoting *National Wildlife Federation v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (emphasis in original)).

The challenged Mass Gatherings Order has yet to be enforced against Plaintiffs in relation to their participation in protests. But "an actual arrest, prosecution or other enforcement action is not a prerequisite" to establish an injury-in-fact. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). In pre-enforcement challenges, like this one, the "Supreme Court has recognized that an allegation of future injury may satisfy the injury-in-fact requirement if the alleged threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Susan B. Anthony List*, 573 U.S. at 158 (cleaned up)). More specifically, a plaintiff satisfies the injury-in-fact requirement where he alleges: (1) "an intention to engage in a course of conduct arguably

8

affected with a constitutional interest," (2) that is "proscribed by a [law]," and (3) "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted). The Court will consider, in turn, whether Plaintiffs have met each element.

### a

The right to assemble peaceably and petition the government for a redress of grievances is "among the most precious of liberties safeguarded by the Bill of Rights." *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967). The Supreme Court has repeatedly accorded constitutional protection to individuals engaging in protests and similar methods of expression. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152 (1969) (citing various cases in support of this proposition). And Plaintiffs are very clear in their intention to exercise this right. As set forth above, they have held protests in the recent past and represent they plan to hold "another Re-Open Kentucky Protest [on] May 23, 2020." [R. 6-1 at 10 (citation omitted).] To satisfy this first element, Plaintiffs need only show "an intention to engage in a course of conduct arguably affected with a constitutional interest[.]" *Susan B. Anthony List* 573 U.S. at 159. It is clear they have done so.

### b

Plaintiffs must also show the course of conduct in which they intend to engage—here, gathering to protest on Capitol grounds—is prohibited by law. As above, this element is easily met. The Mass Gatherings Order clearly states that "[a]ll mass gatherings are hereby prohibited." [R. 1-4 at 1.] The order includes exceptions for certain activities, none of which address the protests or similar conduct. *Id.* Governor Beshear does not dispute that, on the face of the Mass Gatherings Order, that protests and similar gatherings are prohibited. The Governor argues, however, that it will not be enforced against Plaintiffs. That does not change the analysis

on this element. Based on the language of the presently enacted Mass Gatherings Order, Plaintiffs have clearly demonstrated that the conduct in which they intend to engage has been proscribed.

c

The third and final consideration is whether there is a credible threat of prosecution against Plaintiffs. The mere existence of a proscriptive law or a generalized threat is not enough. *McKay*, 823 F.3d at 868; *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1021 (9th Cir. 2012). To establish a credible threat, a plaintiff must allege subjective chill on protected speech[3] and provide some indication of imminent enforcement or prosecution as against the plaintiff. *McKay*, 823 F.3d at 868. Subjective chill alone, without some indication of imminent enforcement, is insufficient to establish injury in fact in the pre-enforcement context. *Id.* at 868–69. To determine whether an indication of imminent enforcement exists, the Sixth Circuit has looked to whether plaintiffs can "point to some combination of the following factors": "(1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; and/or (3) an attribute of the challenged [law] that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." *McKay*, 823 F.3d at 869 (internal citations omitted). Courts may also consider "a defendant's refusal to disavow enforcement of the challenged [law] against a particular plaintiff." *Id.* Notably, the Sixth Circuit has "declined to find a credible threat of prosecution . . . where plaintiffs have failed to show [a combination of the above factors] and where the record is silent as to whether the defendants threatened to punish or would

---

[3] The right to assemble and the right to free speech, although "not identical, are inseparable." *United Mine Workers*, 389 U.S. at 222. For purposes of the pre-enforcement standing analysis, the Court will assume that subjective chill on the right to assemble meets the threshold "subjective chill" requirement.

10

have punished a plaintiff for proposed conduct . . . ." *Id.* (internal citations and quotations omitted).

First, there is no allegation of a history of past enforcement of the Mass Gatherings Order against Plaintiffs or anyone else regarding their specific conduct. This latter point—enforcement as it relates to the conduct at issue—is important. Plaintiffs have attempted to establish a history of enforcement by pointing to past actions taken by law enforcement officials, specifically as it relates to measures taken against those attending church. [*See* R. 20 at 4.] But courts look to whether the same conduct has been the focus of enforcement actions, not whether the law has been enforced at all. *Susan B. Anthony List*, 573 U.S. at 164 (cleaned up) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical."). Plaintiffs have not provided any allegation as to enforcement taken against any individual for taking part in a protest or similar conduct.

This brings the Court to the second factor—whether Plaintiffs allege receipt of enforcement letters or other warnings specific to Plaintiffs. Here, Plaintiffs point to two alleged warnings. First, Plaintiffs note that, on May 3, 2020, Governor Beshear, when asked whether peaceful protestors should expect enforcement under the order, simply responded, "we'll see." [R. 6-1 at 10 (citation omitted).] Second, Plaintiffs point to signs that were posted on the barriers around the state Capitol reading: "Pursuant to 200 K.A.R. 3:020, the Kentucky State Police has deemed this area a restricted zone. No one is permitted past this point. Failure to adhere to this Regulation may result in Criminal Penalty under K.R.S. 511.070." *Id.* (cleaned up).

The KSP signs clearly are not a specific warning to Plaintiffs. Instead, they were posted in a public area for anyone to see. To establish this second factor, the Sixth Circuit has looked for warnings more directly targeted at specific individuals. *See McKay*, 823 F.3d at 869–70. In

11

fact, in *McKay*, the Sixth Circuit found that signs addressing the public generally were insufficient as it relates to this "warning factor." For the same reason, Plaintiffs' reliance on the "we'll see" statement is unavailing in this context. The Court acknowledges that, in the First Amendment context, an implicit threat of punishment and intimidation may establish imminent threat of enforcement. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019). But, importantly, the Governor's statement was not a specific warning to Plaintiffs, it was a statement made in response to a reporter's questioning about enforcement more generally. Again, at the risk of redundancy: general warnings are insufficient in this context. Moreover, Plaintiffs' argument ignores the fact that the Governor has effectively walked these statements back. As analyzed more thoroughly below, the Governor now indicates no one will be prosecuted for protesting.

Plaintiffs' argument on the third factor—that an attribute of the challenged law makes enforcement easier or more likely—clearly fails. Here, Plaintiffs note that Governor Beshear has created the "COVID-19 Reporting Hotline" by which Kentuckians can lodge complaints about non-compliance with coronavirus mandates. [R. 20 at 5.] Providing such a hotline, they argue, makes enforcement more likely as any member of the public can report, and have reported, conduct which potentially violates the Mass Gatherings Order. Ultimately, however, this is not enough.

As this Court recently explained when faced with this same argument, the existence of the hotline falls short of establishing a likelihood of success on this third *McKay* factor for two reasons: one technical and one practical. Opinion & Order, *W.O. v. Beshear*, 3:20-cv-00023, R. 39 at 11 (E.D. Ky. May 9, 2020). First, as a technical matter, the hotline is not an attribute of the Mass Gatherings Order but, instead, is a channel of communication separately created to field

complaints about *any* non-compliance with coronavirus mandates. Second, as a practical matter, the creation of a standalone hotline to report possible noncompliance with a set of recent directives does not, in and of itself, necessarily make enforcement more likely. On this factor, courts have looked for attributes that more clearly indicate that enforcement is likely—like, for example, a provision which allowed any member of the public to initiate enforcement of a law by filing a formal grievance. *See Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 452 (6th Cir. 2014). At this juncture, Plaintiffs fail to point to any such attribute or to make any further argument as it relates to this factor.

Lastly, the Court turns to the final factor to be considered—"a defendant's refusal to disavow enforcement of the challenged [law] against a particular plaintiff." *McKay*, 823 F.3d at 869. This factor cuts squarely against Plaintiffs. At no point during this litigation has Governor Beshear refused to disavow enforcement of the Mass Gatherings Order against these Plaintiffs. In fact, the opposite is true. In response to Plaintiffs' motion, counsel for the Governor filed a Declaration made by KSP Commissioner Rodney Brewer which expressly disavows enforcement. [R. 19-3.] Commissioner Brewer states that KSP "will not deny any individual or vehicle access to the upper level of the parking structure," "will not prohibit or prevent any individual from engaging in a peaceful protest," and "will not close or block off any public sidewalk" on the grounds of the Capitol on May 23, 2020. *Id.*

At the preliminary injunction hearing, Plaintiffs expressed concern that Commissioner Brewer's declaration did not also disclaim enforcement after the fact. For example, Plaintiffs pointed out that nothing in the declaration prevented issuance of health department notices mandating quarantine for those in attendance. But as counsel for the Governor explained,

13

Brewer's declaration was not a "trick"; the Governor does not intend to enforce the Mass Gatherings Order against Plaintiffs before, during, or after the scheduled protest.

Finally, Plaintiffs take issue with the Governor's refusal to completely disavow the Mass Gatherings Order as it pertains to protests generally. If the Governor does not intend to enforce the order, why not amend it to specifically exempt protests? But this is not what the Court is asked to consider. *McKay* instructs the Court consider "defendant's refusal to disavow enforcement of the challenged statute against a *particular plaintiff*." 823 F.3d at 869 (emphasis added).

As to these Plaintiffs, the record is clear: the order will not be enforced against them for participating in the protest planned for May 23, 2020. This is perhaps recognition on the part of the Governor of the important constitutional considerations at play. In his attempts to flatten the coronavirus curve, Governor Beshear can be forgiven a constitutional learning curve. None of us have ever done this before. To his credit, as constitutional challenges to Governor Beshear's public health measures have mounted, he has continued to evolve his stance. Challenges to the orders prohibiting interstate travel and in-person religious services have spurred amended and modified orders permitting those activities. And although that has not happened here, it behooves the Court to point out that Plaintiffs are getting exactly what they've asked for: the freedom to exercise their First Amendment rights, free from enforcement of the Mass Gatherings Order. Even if the Court were to expand its inquiry beyond these particular Plaintiffs, counsel for the Governor stated at the recent hearing that the order would not be enforced against anyone for engaging in a peaceful protest beyond the May 23 protest.

Because Plaintiffs have failed to show a likelihood of success in establishing any of the *McKay* factors, Plaintiffs fail to show a likelihood of success of establishing a credible threat of

prosecution. *See Plunderbund*, 753 F. App'x at 372. This, of course, is a necessary element to establish injury-in-fact as part of the pre-enforcement standing analysis. *Id.* The Court therefore finds that, more broadly, Plaintiffs fail to establish a likelihood of success on the merits. *See Waskul*, 900 F.3d at 256 n. 4 (citation omitted) ("Put simply, a party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction.").

### III

Litigants in this Court are justified in emphasizing that the Constitution must be followed even in the face of a world pandemic. This case stands for the unremarkable proposition that not only is that true, but it is true in all aspects. Since the Plaintiffs lack standing, the Court lacks the power to decide the constitutional question. Consequently, Plaintiffs' Emergency Motion for Preliminary Injunction [R. 6] is **DENIED**.

This the 21st day of May, 2020.

Gregory F. Van Tatenhove
United States District Judge