UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| TONY RAMSEK, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil No. 3:20-cv-00036-GFVT |
| | ) | |
| v. | ) | |
| | ) | **OPINION** |
| ANDREW BESHEAR, in his Official | ) | **&** |
| Capacity as Governor of Kentucky, *et al*., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Trust us. That is the position the Governor takes in this case. Trust us, as policy makers, to make the best decisions for the citizens of the Commonwealth in responding to a pandemic. In large measure the Governor is right. The political branches, the policy makers, are far better provisioned than judges to gather the information needed to make informed decisions.

But in one respect the Governor is wrong. His power is not absolute. When it comes to restrictions on our liberty, courts must not accept as sufficient whatever explanation is offered. In exercising its constitutional function, it is not enough to simply "trust" the conclusion of the political process that a restriction is necessary or right. The teaching of the cases is clear. Even in times of crisis, the Constitution puts limits on governmental action.

As explained below, a blanket prohibition on gathering in large groups to express constitutionally protected speech is unconstitutional. When liberty is at stake, policy makers must be more precise.

**I**

On March 19, 2020, as part of broader efforts to "flatten the curve," acting Secretary of the Cabinet for Health and Family Services Eric Friedlander, issued an order prohibiting "mass gatherings." [R. 1-4.] Per Secretary Friedlander's Order, mass gatherings include "any event or convening that brings together groups of individuals, including, but not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities." *Id.* Some activities which necessarily involve large groups of individuals were excluded. "[A]irports, bus and train stations, medical facilities, libraries, shopping malls and centers, or other spaces where persons may be in transit" were not included within the definition of "mass gathering," nor were "typical office environments, factories, or retail or grocery stores[.]" *Id.* As Plaintiffs emphasize, protests are not included in this list of exemptions. [R. 6-1 at 4.]

Plaintiffs are four Kentucky residents who are deeply concerned about Governor Beshear's actions in response to Covid-19 and desire to express their views through protesting. [R. 6-1 at 1–2.] On April 15, approximately 100 individuals organized a protest at the State Capitol during the Governor's press conference. [R. 1 at ¶ 30.] Concerned about the Commonwealth's economy, protestors expressed their opposition to the restrictions the Governor has put in place during the coronavirus pandemic. *Id.* In response, Governor Beshear took steps to minimize the impact of the protests during his daily press conference. *Id.* at ¶ 31. The Kentucky State Police (KSP) restricted the public's access to the area on the southeast side of the Capitol building where the Governor's briefings take place. *Id.* They placed saw-horse barriers on the patio of the Capitol and encircled the lawn outside the Governor's office suite with yellow tape. *Id.* A sign attached to the barrier states, "Pursuant to 200 K.A.R. 3:020, the Kentucky

State Police has deemed this area a restricted zone.  No one is permitted past this point.  Failure to adhere to this Regulation may result in Criminal Penalty under K.R.S. 511.070."  *Id.*

During the Governor's daily briefing on April 16, further measures were taken by the State Health Commissioner, Dr. Steven Stack, when he released a public announcement in regard to in-person mass gatherings at the Capitol.  *Id.* at ¶ 33.  Dr. Stack created an alternative option for people to protest on Capitol grounds, in which people may drive-in and drive-through the top floor of the Capitol parking garage.  *Id.*  However, "participants must remain in their vehicles, in designated parking areas and follow Centers for Disease Control and Prevention (CDC) recommendations."  *Id.*  Dr. Stack said, "these options allow people to use their voices and be heard while protecting the public health."  *Id.*  For Plaintiffs, this alternative is not good enough. They complain that the designated area only has space for approximately 300 vehicles and is too far away from the Capitol to be seen or heard.  *Id.* at ¶ 35.  Plaintiffs also argue these accommodations are accommodations in name only.

According to Plaintiffs, at a rally held on May 2, KSP blocked streets surrounding the Capitol to prevent drive-through protesting, and eventually blocked off the entire perimeter of the protest.  *Id.* at ¶¶ 41, 45.  Plaintiff Ramsek complains that he attempted to utilize the designated zone, but police blocked the entrance of the parking garage.  *Id.* at ¶ 42.  Defendants disagree with these allegations and state that these areas were accessible on that date.  [R. 19 at 8–9.]  They explain that certain entrances and exits were blocked in order to ensure an orderly flow of traffic during the protest, in consideration of both social distancing and safety protocols.

Over the next month, there were many changes to restrictions as the Commonwealth started to gradually reopen.  On May 8, two district courts in Kentucky issued orders that preliminarily enjoined the Governor from enforcing the prohibition on mass gatherings with

respect to any in-person religious service which adheres to applicable social distancing and hygiene guidelines. *Maryville Baptist Church, Inc. v. Beshear*, 2020 U.S. Dist. LEXIS 70072 (W.D. Ky. May 8, 2020); *Tabernacle Baptist Church, Inc. of Nicholasville, Kentucky v. Beshear*, 2020 U.S. Dist. LEXIS 81534 (E.D. Ky. May 8, 2020).  The following day, the Secretary amended the Mass Gatherings Order by removing "in-person services of faith-based organizations" from the prohibition on mass gatherings, so long as the services follow the guidelines for places of worship and social distancing guidance.  [*See* R. 19 at 3 n.4.]  On May 11, the Governor began reopening sectors of the economy that were closed due to Covid-19.  [R. 45 at 4.]  However, each entity reopening must meet certain minimum requirements such as social distancing and certain hygiene measures.  *Id*.  On May 22, restaurants were allowed to reopen at 33% capacity, and the Mass Gatherings Order was amended to allow for groups of up to 10 to gather.  [R. 44 at 3.]  On June 29, the Mass Gatherings Order is set to be amended again to allow groups of up to 50 to gather.  *Id*.

This brings the Court back to the present case.  Plaintiffs filed their Complaint on May 10 [R. 1] and Motion for Temporary Restraining Order (TRO) [R. 6] on May 12, which the Court ultimately denied on May 15 [R. 10].  Following the initial hearing, Plaintiff Ramsek submitted an application to hold an event on the Capitol grounds on May 23.[1]  [R. 19 at 8.]  After reviewing the application, Defendants tried to negotiate with Plaintiffs in regard to the restrictions protestors would need to follow if the permit were granted.  Under Defendants' proposal, protestors would have access to the upper or top level of the parking structure next to

---

[1] 200 KAR 3:020 Section 2.(1) requires any "visitor seeking to hold an event at a state facility or on state grounds" to complete an application that requires information regarding the place, time, and number of people attending the event.  Any application may be denied if the event poses a safety or security risk.  *Id*. at Section 2.(1)(d)3.  No party is contesting this Regulation, as evidenced by the parties' attempts to negotiate the terms of such a permit.

4

the Capitol Annex Building, the parking lots behind the Capitol Annex Building, as well as the parking lot next to the Capitol. *Id*. The public thoroughfare that loops around the Capitol would also be accessible by any vehicle, so long as no vehicle blocked ingress and egress for emergency vehicles, and did not prevent public business from being conducted. *Id*. Individuals would be required to engage in social distancing and hygiene measures recommended by the CDC and public health officials. *Id*. A resolution was never reached by the parties.

Thereafter, the Court denied Plaintiffs' Emergency Motion for Preliminary Injunction, finding that Plaintiffs lacked standing. [R. 22.] Plaintiffs appealed this decision to the Sixth Circuit [R. 23] and requested this Court issue an injunction pending appeal [R. 24], which was also denied [R. 27]. On May 23, the Sixth Circuit entered an order concluding Plaintiffs do have standing, and granting, in part, their motion for an injunction pending appeal. [R. 29.] The Sixth Circuit enjoined Defendants from prohibiting protesters from gathering for drive-in and drive-through protests but did not determine whether Plaintiffs may conduct in-person protests. *Id*. On May 29, the Sixth Circuit vacated this Court's order denying Plaintiffs' preliminary injunction and determining Plaintiffs lacked standing. [R. 31.] The Sixth Circuit remanded the case for additional findings of fact and conclusions of law "concerning a prohibition on in-person protests and whether there are features of large in-person protests that distinguish them from other mass gatherings, such as at retail venues, which the Order permits, and church, which our prior decisions permit." *Id*.

In light of the Sixth Circuit Opinion, Plaintiffs filed an Emergency Motion for Discovery requesting to depose Dr. Steven Stack in order to develop the factual record. [R. 30.] The Court held a telephonic status conference on June 1, at which the parties discussed the potential impact of the recent Supreme Court decision in *South Bay United Pentecostal Church v. Newsom*, 140

S. Ct. 1613 (May 29, 2020) (Mem).  The Court directed the parties to file simultaneous briefing

in regard to this issue and Plaintiffs' Motion for Expedited Discovery in preparation for a hearing

held on June 4.  [R. 33.]

Following the hearing, the Court granted Plaintiffs' Motion for Expedited Discovery and

ordered Plaintiffs to promptly notice Dr. Steven Stack for deposition in regard to the issue of

differences between in-person protests and other mass gatherings currently allowed under the

Mass Gatherings Order.  [R. 38.]   During the deposition, Dr. Stack confirmed that the orders

issued during the pandemic are generated based on his assessment of risks and how to best

minimize the risks of spreading the virus.  [R. 43 at 9.]  Dr. Stack emphasized that "large mass

gatherings are an elevated risk of spreading this infection."  *Id*. at 97.  The risk of transmission of

disease and infection increases as the crowd grows larger and spacing between individuals

becomes more difficult.  *Id*. at 58.  The virus can be spread by droplets from coughing, sneezing,

speaking, shouting and singing.  *Id*. at 12–13.  While Kentucky's Mass Gathering Order prohibits

gathering in groups of more than ten, Dr. Stack explained that the CDC defines "mass gathering"

as a group of more than 250 people.  *Id.* at 68.[2]

As Dr. Stack inferred, outdoor gatherings are less risky than indoor gatherings.  *Id*. at 50–

51.  Many regulated activities such as church services and restaurants have 33% capacity

requirements, but these are only for indoor gatherings.  *Id*. at 28–33, 39–40.  There are no limits

on the number of people who can attend permitted outdoor activities, such as church and

auctions, as long as they keep six feet apart and adhere to the regulations.  *Id*. at 36–38.  Office-

---

[2] The varied use of the term "mass gathering" is confounding.  Kentucky's current Order currently
prohibits "mass gatherings" of more than 10 individuals.  In contrast, the CDC defines a "mass gathering"
as a group of 250 people or more.  Dr. Stack refers to groups of 250 people or more as a "*large* mass
gathering."  [R. 43 at 97 (emphasis added).] Regardless of the nomenclature, groups of more than ten are
presently prohibited from congregating together in Kentucky.  On June 29, Kentucky plans to amend its
order to allow groups of fifty or less to meet.

based businesses are allowed to open, but no more than 50% of employees are to be physically present in the office, and they must adhere to the guidelines. *Id.* at 48.

Dr. Stack testified that control measures could be placed on protests, but his concern was that previous protests were not organized to encourage precautions of social distancing and mask wearing. *Id.* at 56. Social distancing, mask wearing, and handwashing are the most important measures to minimize the risk of infection during such gatherings, but they are hard to enforce on a large crowd. *Id.* at 61. Dr. Stack also explained that transitory activities, such as grocery stores, are less risky than communal activities, such as church, factories, or offices. *Id.* at 84. The Court ordered simultaneous briefing upon the parties' receipt of the deposition transcript. [R. 38.] Limited discovery and simultaneously briefing are now complete. [R. 43; R. 44; R. 45.]

**II**

**A**

This is an odd case. It is odd because other than a disagreement about access to the Capitol grounds in Frankfort on one occasion, there is no evidence in the record that Plaintiffs have faced any sanction for having exercised their First Amendment rights related to protest-related gatherings. Actually, no one has.

Once more, the Governor has expressly declared that even though violating an order of the Executive Branch is punishable as a misdemeanor, he will not seek that consequence for anyone. So, the position of the Executive Branch is that you must not assemble in large groups to protest but there will be no legal consequence if you do.

Words aside, it is difficult to see how the Secretary's order is anything but advisory. Nevertheless, the plain language of the order is proscriptive. And this Court is bound to accept as settled that these Plaintiffs have standing despite a lack of specific injury. [R. 29.]

7

Across the country courts are being asked to review state executive branch actions being taken in the face of the Covid-19 pandemic.  One case has even reached the Supreme Court, albeit only in the context of a plea for preliminary relief.  *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct 1613.  It is this case that Defendants believe decides this matter.  For several reasons, that demands too much of the preliminary views of one Justice.

In *South Bay*, plaintiffs filed suit challenging the application of California's stay-at-home order to in-person religious services.  *See S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020).  After both the district court and Ninth Circuit denied plaintiffs' application for injunction pending appeal, the Supreme Court similarly denied relief in a 5-4 decision.  140 S. Ct. 1613.  Chief Justice Roberts issued a concurring opinion, which was not joined by any other Justice, expounding on the reasons for denial.[3]  *See id.*  Defendants now contend this concurring opinion "decisively resolves this case."  [R. 36 at 2.]  Plaintiffs disagree, arguing that Justice Roberts' opinion "does not create any precedent, much less binding precedent."  [R. 35 at 5.]

The Court finds that, while informative, Justice Roberts' concurring opinion does not create precedent which controls in this case.  To start, Justice Roberts analyzed a different executive order as it concerned a separate First Amendment right in a distinct factual

---

[3] The other four Justices who voted to deny relief gave no indication as to the basis for their decisions. On the other hand, three of the four Justices who voted to grant the application for relief—Justices Kavanaugh, Thomas, and Gorsuch—joined in a dissenting opinion authored by Justice Kavanaugh which clearly laid out the basis for their respective decisions.  140 S. Ct. 1613 (Kavanaugh, J., joined by Thomas & Gorsuch, JJ., dissenting).  In an opinion that quoted heavily from the Sixth Circuit's decision in *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020), Justice Kavanaugh concluded that "California's 25% occupancy cap on religious worship services indisputably discriminates against religion, and such discrimination violates the First Amendment."  *Id.* (citation omitted).  In reaching this conclusion, the dissenting Justices explained that California had failed to provide "a compelling justification for distinguishing between (i) religious worship services and (ii) the litany of other secular businesses that are not subjected to an occupancy cap."  *Id.*

8

circumstance. Separately, and perhaps most importantly, the Court finds significant the procedural context in which the Supreme Court acted.

On review, a denial of injunctive relief pending appeal by the Supreme Court is similar in many ways to a denial of a writ of certiorari. *See, e.g.*, *Teague v. Lane*, 489 U.S. 288, 296 (1989); *see also Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1181 (1996) (Scalia, J. dissenting). Like a denial of writ of certiorari, a variety of considerations underlie a denial of injunctive relief—considerations beyond simply the merits of the case. *See, e.g.*, *Janklow*, 517 U.S. at 1181 (Scalia, J. dissenting) (describing such decisions as "discretionary (and unexplained) denials"); *Brown v. Gilmore*, 533 U.S. 1301 (2001) (Rehnquist, C.J.). Indeed, in *Respect Maine PAC v. McKee*, the Supreme Court explained that to warrant such relief "demands a significantly higher justification than a request for a stay, because unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts." 562 U.S. 996 (2010) (cleaned up). The legal principles applied by the Supreme Court in this context lead naturally to a conclusion that, like opinions accompanying the denial of certiorari, opinions accompanying the denial of injunctive relief pending appeal "cannot have the same effect as decisions on the merits." *Teague*, 489 U.S. at 296; *see also Janklow*, 517 U.S. at 1181 (Scalia, J. dissenting) (explaining the impropriety of lower courts possibly giving authoritative effect to a two-Justice opinion concurring in a denial of an injunctive relief pending appeal).

Notwithstanding the above considerations, certain lower courts have accorded significant weight to Justice Roberts' concurring opinion, without any extended analysis of the precedential considerations laid out above. *See, e.g.*, *Calvary Chapel Lone Mountain v. Sisolak*, No. 220CV00907RFBVCF, 2020 WL 3108716, at *2 (D. Nev. June 11, 2020). At the very least, if

9

the concurring opinion is to be accorded weight, then the fact that no other Justices joined the opinion must be acknowledged and considered.[4]  In *Marks v. United States*, the Supreme Court explained that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of the five justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977).  In expanding on this principle, the *Marks* court addressed cases decided on the merits and the principle articulated has since been applied in those circumstances. *See id.* at 193–94 (discussing concurring opinions in First Amendment decisions).  Logically, where a concurring opinion accompanies a decision in which the court did not fully address the merits, like here, the opinion cannot be said to carry *more* weight than an opinion accompanying a decision on the merits.  At the very most, the grounds set forth by Justice Roberts in support of his decision to deny injunctive relief in *South Bay* should be interpreted as narrowly as possible. *Marks*, 430 U.S. at 193.

So, what was the basis for Justice Roberts' decision?  Defendants argue that Justice Roberts' concurrence "conclusively explains that state elected officials have broad latitude to enact public health measures . . . ."  [R. 36 at 2.]  True, in analyzing the California restrictions, Justice Roberts found they "appear[ed] consistent with the Free Exercise Clause of the First Amendment."  *Id.*  And, he further explained that a state has broad latitude in restricting social activities in times of emergency which "should be subject to second-guessing" only where those broad limits are exceeded.  *Id.*  But Justice Roberts' analysis must be viewed in light of the standard applied.

---

[4] The Court has no reason to speculate that, even though they did not join the opinion, the other four Justices who voted to deny relief agreed with Justice Roberts' basis for denying relief.

As Justice Roberts noted, the standard for the Supreme Court to grant an injunction pending appeal is a high bar: "This power is used where 'the legal rights at issue are indisputably clear . . . .'" *South Bay*, 140 S. Ct. 1613 (citation omitted). This is so because, as noted above, "unlike a stay, an injunction 'does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts.'" *Respect Maine PAC*, 562 U.S. 996 (cleaned up). So, applying these principles, Justice Roberts denied relief, concluding that "[t]he notion that it is 'indisputably clear' that the [California] limitations are unconstitutional seems improbable." *Id.* at *2.

Accordingly, the Court declines to accord too broad of a precedential effect to Justice Roberts' concurrence in *South Bay*. A narrow reading is required and simply leads to the conclusion that Justice Roberts found that it was not "indisputably clear" that the California law restricting in-person religious services violated the Free Exercise Clause. While informative, this conclusion does not create precedent which controls in this case.

Also relevant is the Sixth Circuit's recent teaching on similar issues. In *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020), and *Maryville Baptist Church v. Beshear*, 957 F.3d 610 (6th Cir. 2020), the Sixth Circuit reviewed the constitutionality of the Mass Gatherings Order at issue in this case. In both instances, plaintiffs argued they could show a likelihood of success on the merits in proving that the Mass Gatherings Order violated the Free Exercise Clause as applied to church services. The Sixth Circuit agreed, finding that the Mass Gatherings Order had "several potential hallmarks of discrimination."[5] *Maryville Baptist*, 957 F.3d at 612–14; *Roberts*, 958 F.3d at 413.

---

[5]As of May 9, 2020, the order prohibiting mass gatherings has been amended to allow in-person services of faith-based organizations, provided those present abide by Kentucky's Guidelines for Places of Worship. [*See* R. 19 at 3 n.4.]

Justice Roberts' concurrence in *South Bay*—which can fairly be read to express disagreement with the Sixth Circuit's reasoning in these cases—*may* indicate that five members of the Supreme Court would decide the cases differently.  But, for the reasons set forth above, the Court declines to conclude definitively that they would—and the Court will certainly not conclude, as Defendants propose, that the "Supreme Court has now rejected" the Sixth Circuit's reasoning.  [*See* R. 36 at 4.]  At this juncture, the *Roberts* and *Maryville Baptist* decisions remain good law which this Court must follow to the extent those holdings are applicable.  These precedential considerations resolved, the Court now turns to the substance of Plaintiffs' First Amendment claim.

## B

To issue a preliminary injunction, the Court must consider: 1) whether the movant has shown a strong likelihood of success on the merits; 2) whether the movant will suffer irreparable harm if the injunction is not issued; 3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing the injunction.  *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citations omitted).  The Court of Appeals clarified that, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor."  *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.2012)).  However, even if the plaintiff is unable "to show a strong or substantial probability of ultimate success on the merits" an injunction can be issued when the plaintiff  "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued."  *In re*

*Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

**1**

Plaintiffs' alleged irreparable injury is a violation of their First Amendment rights.  [R. 6-1 at 5.]  The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably assemble, and to petition the Government for a redress of grievances."[6]  U.S. Const. Amend. I.  Plaintiffs complain that the Mass Gathering Order abridges their freedom of speech by prohibiting political protests, and their freedom to assemble and petition the government by limiting the number of people who may gather for that purpose.  [R. 1 at ¶¶ 59–80.]

Of course, these rights are not absolute.  *See Citizens for Tax Reform v. Deters*, 518 F.3d 375, 375 (6th Cir. 2008).  There is a push and pull between the public's privileges and the government's power to regulate in this arena.  "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. For Krishna Consciousness*, 452 U.S. 640, 467 (1981).  At the same time, "to preserve this freedom, government entities are strictly limited in their ability to regulate private speech in such 'traditional public fora.'"  *Pleasant Grove v. Summum*, 555 U.S. 460, 469 (2009) (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

Although the First Amendment protects several categories of rights, it is often difficult in practice to determine where one right ends and the next begins.  This is particularly true with

---

[6] The First Amendment was made applicable to the states through the Fourteenth Amendment.  *See Thornhill v. Alabama*, 310 U.S. 88, 95 (1940).

freedom of speech and freedom of assembly. *De Jonge v. State of Oregon*, 299 U.S. 353, 364 (1937) ("The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."). Consequently, Courts typically evaluate free speech, assembly and petition claims under the same analysis. *See Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 (1984); *see also Citizens for Tax Reform*, 518 F.3d at 379; *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999); *United States v. Winslow*, 116 Fed. App'x 703, 704 (6th Cir. 2004). This is so because it is not just the speaking, chants and signs that are expressive; it is also the message implicit in the size of a crowd. *Cf. NAACP v. Button*, 371 U.S. 415, 430 (1963) (finding that "the First and Fourteenth Amendments protect certain forms of orderly group activity"); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association[.]"); *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) ("The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.") (quoting *United States v. Cruikshank*, 92 U.S. 542, 552 (1875)).

**a**

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). Plaintiffs wish to gather in protest on the Kentucky State Capitol grounds. The parties agree the state Capitol grounds are a public forum.[7] Public forums are places "which by long tradition . . . have

---

[7] Plaintiffs characterize the Capitol building as "a traditional public forum and/or a designated public forum[.]" [R. 6-1 at 5.] In their briefing, Defendants refer to the Capitol as simply a public forum. [R. 19 at 15.] Whether the Capitol is a traditional public forum or a designated public forum is of no effect. In either type of public forum, "[r]easonable time, place, and manner regulations are permissible, and a

been devoted to assembly and debate[.]" *Id.* at 45.  Content-based restrictions on expressive

activity in public forums are subject to strict scrutiny.  *See Miller v. City of Cincinnati*, 622 F.3d

524, 534 (6th Cir. 2010).  That is, a content-based restriction must be necessary to serve a

compelling state interest, and any restriction must be narrowly tailored to achieve that interest.

*Id.*  A content-based restriction on speech is one that singles out a specific subject matter for

differential treatment.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 157 (2015).  In contrast,

content-neutral time, place, and manner restrictions on speech are permissible to the extent they

are "narrowly tailored to serve a significant government interest, and leave open ample

alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,

460 U.S. 37, 46 (1983).  The same is true of expressive conduct—such as gathering—in a public

forum.  *See Winslow*, 116 Fed. App'x at 704 (citing *Clark v. Cmty. for Creative Non-Violence*,

468 U.S. 288, 293 (1984)).

        The unprecedented nature of the times in which we live, and the complexity of

constitutional law generally, make the regulation challenged here difficult to place.  The

challenged Order explicitly prohibits "mass gatherings" which "include any event or convening

that brings together groups of individuals, including, but not limited to, community, civic, public,

leisure, faith-based,[8] or sporting events; parades; concerts; festivals; conventions; fundraisers;

and similar activities."  [R. 1-4.].  The Supreme Court has instructed that "[t]he principal inquiry

in determining content neutrality, in speech cases generally and in time, place, or manner cases

in particular, is whether the government has adopted a regulation of speech because of

---

content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry Educ. Ass'n*, 460 U.S. at 46.

[8] As previously mentioned, the order prohibiting mass gatherings has been amended to allow in-person services of faith-based organizations, provided those present abide by Kentucky's Guidelines for Places of Worship.  [*See* R. 19 at 3 n.4.]

disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791

(1989). Further, "a regulation that serves purposes unrelated to the content of expression is

deemed neutral, even if it has an incidental effect on some speakers or messages but not others."

*Id.*

Here, the Order prohibiting mass gatherings existed prior to Plaintiffs' message. In fact,

Plaintiffs' protest—and their beliefs about fully reopening the economy—are a response to the

Order. Governor Beshear may disagree with the content of the protestors' message, but it cannot

be said it was enacted with the intent to suppress Plaintiffs' political point of view. Nor has it

been used to stifle the political expression of others. In the wake of the death of George Floyd in

Minneapolis, the Black Lives Matter movement migrated to Kentucky. Mike Stunson,

*Kentuckians Protested for George Floyd, Breonna Taylor Last Weekend. See the Scenes*,

LEXINGTON HERALD-LEADER (June 1, 2020), http://www.kentucky.com/news/state/kentucky/

article 243161386.html. Although public demonstrations have been occurring almost daily

throughout Kentucky, there have been no reports of any enforcement actions taken against

participants for violating the Mass Gathering Order. In fact, Governor Beshear attended and

spoke at a Black Lives Matter rally on June 5, 2020. [R. 45 at 6.]

Plaintiffs imply the lack of enforcement and the Governor's attendance is further

evidence of discriminatory treatment against Plaintiffs. They go too far. Perhaps if Plaintiffs

had been prosecuted for gathering to protest coronavirus restrictions this argument would be

justified. But as previously explained, other than a disagreement about access to the Capitol

grounds in Frankfort on one occasion, there is no evidence in the record that the Plaintiffs have

faced any sanction for having exercised their First Amendment rights.

Related to this argument is Plaintiffs' contention that the Mass Gatherings Order is an impermissible content-based restriction on speech based on the identity of the speaker. [R. 45 at 11.] Plaintiffs point out "[i]f the Governor wants to give a press briefing at the Capitol, i.e., his own personal mass gathering, it is permitted. But, if a group of peaceful protestors want to gather to criticize certain unconstitutional actions of the Governor, too bad because the Governor has banned it." *Id.* Upon a preliminary review, the Court finds this argument is without merit.

The First Amendment does not regulate government speech. "The First Amendment prohibits Congress and other government entities and actors from 'abridging the freedom of speech'; the First Amendment does not say that Congress and other government entities must abridge their own ability to speak freely." *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (citing *Pleasant Grove v. City of Summum*, 555 U.S. 460, 467 (2009)). Although Plaintiffs' briefs do not attempt to address the distinction between private and government speech, the Governor's official press briefings are government speech not subject to First Amendment scrutiny. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2248 (2015). Despite Plaintiffs' attempts to manufacture it, there is no evidence in the record that the Governor "adopted a regulation of speech because of disagreement with the message it conveys." *Rock Against Racism*, 491 U.S. at 791.

Far from an interdiction on political speech, the Mass Gatherings Order is one of many orders issued by the state designed to curb the spread of the coronavirus by limiting Kentuckians' interactions with one another, thereby decreasing opportunity for spread. [*See* R. 43-4; R. 43-5; R. 43-6; R. 43-7; R. 43-10.] And although the Court does not believe it is Defendants' objective, by prohibiting gatherings, the Order incidentally prohibits public political protests like Plaintiffs'. This matters, because this case is not just about what is being said in

17

speeches and chants and signs.  It's about what is being said with numbers.  And the Constitution

protects that as well.  While not "speech" in the purest sense of the word, gathering, picketing,

and parading "constitute methods of expression, entitled to First Amendment protection."

*Shuttlesworth v. Birmingham*, 394 U.S. 147, 152 (1969) (citing *Cox v. Louisiana*, 379 U.S. 536,

555 (1965)).  Therefore, it appears the Mass Gathering order fits the mold of "a regulation that

serves purposes unrelated to the content of expression," but which has an incidental effect on

speech.  Applying this Supreme Court precedent, the Order is content-neutral.

Still, Plaintiffs argue that the Mass Gatherings Order is a content-based restriction on

speech because it permits people to "gather" in some places—namely, airports, bus stations, and

grocery stores—but not others, such as the Capitol grounds for purpose of political protest.  [R. 6

at 16.]  There is nuance here, and unlike the Sixth Circuit, this Court has had the benefit of time

to grapple with it.  The First Amendment protects the freedom of assembly just as much as it

protects freedom of speech.  And the right to freedom of speech also covers expressive conduct,

which is "conduct that is intended to be communicative and that, in context, would reasonably be

understood by the viewer to be communicative."  *Clark v. Community for Creative Non-*

*Violence*, 468 U.S. 288, 294 (1984).  Restrictions on either must be content-neutral and narrowly

tailored to serve a significant government interest.

Plaintiffs' previous and future-planned protests are plainly speech.  Also, it is easy to see

how simply gathering together, in a time where gathering is prohibited due to a global pandemic,

might fall under the umbrella of "expressive conduct" if one's intent is to protest that prohibition.

But Plaintiffs do not go so far as arguing that individuals making regular use of airports, bus

stations, and grocery stores are doing so with an intention to communicate anything.  Unlike an

individual protesting on the Capitol lawn, one who is grocery shopping or traveling is not, by

18

that action, engaging in protected speech.  *See Dallas v. Stanglin*, 409 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meetings one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.").  To say then that the Order is content-based because it prohibits gathering in certain places, but permits individuals to make use of public transport, grocery stores and the like, is counter intuitive.

Supreme Court precedent constrains the Court to conclude that the Mass Gatherings Order is a content-neutral time, place, and manner restriction on Kentuckian's First Amendment rights.  It restricts the manner in which Plaintiffs may protest by prohibiting large gatherings.  And it circumscribes the time Plaintiffs may gather in protest to the duration state of emergency declaration.  But it only incidentally does either.  Because it is content-neutral, the Order will be upheld if the Governor can show it is "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Perry Educ. Ass'n*, 460 U.S. at 46.

**b**

Plaintiffs do not dispute that the Governor has a significant interest in protecting Kentuckians from Covid-19.  They simply argue the Governor has gone too far in his pursuit of that interest.  Based upon the record before it, the Court agrees.  Plaintiffs are likely to succeed in showing that the Mass Gatherings Order is not narrowly tailored.

A regulation is narrowly tailored if it promotes the significant government interest without unnecessarily abridging speech.  *See Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015).  Under immense time pressure, the Sixth Circuit reasoned that the Mass Gatherings

Order was content-based, and therefore Plaintiffs were likely to succeed on the merits of their claim, because "the Order permits citizens to gather in retail stores, airports, parking lots, *and churches*, but does not permit them to gather for a protest[.]"  [R. 29 at 4.]  Upon further consideration and development of the record, this Court believes the order is content-neutral.[9] *See supra* section II.B.1.a.  The Sixth Circuit's observation is relevant for another reason: retail stores, airports, churches and the like serve as an inconvenient example of how the Mass Gathering Order fails at narrow tailoring.

A blanket ban on large gatherings, including political protests, is not the only way to protect the public health.  Clearly, policymakers have some tools at their disposal which will help mitigate the spread of coronavirus while still allowing Kentuckians to exercise their First Amendment freedoms.  As Dr. Stack explained in his deposition, maintaining a social distance of six feet, wearing masks, and frequent and thorough handwashing each help to reduce the likelihood of transmission of coronavirus from person to person.  [R. 43 at 72.]  The Commonwealth has required implementation of these tools in places like restaurants, office buildings, and auctions, but continues to wholly prohibit gatherings for political protest above a set number no matter the circumstance.  *See id.*

This is problematic.  Defendants are correct that there are certain attributes of political protests that make it inherently more difficult to contain spread of the coronavirus; they are organic, there is little ability to monitor who comes and who goes, people travel out of their communities to attend, and people who are impassioned tend to shout, sing, and embrace.  [R. 43

---

[9] In certain instances, a Sixth Circuit ruling made on preliminary injunction review may warrant "law of the case" treatment—precluding a district court from reconsidering issues addressed in that ruling.  *Howe v. City of Akron*, 801 F.3d 718, 739–41 (6th Cir. 2015).  The Sixth Circuit has explained, however, that such treatment is only proper "when a court reviewing the propriety of a preliminary injunction issues a fully considered ruling on an issue of law with the benefit of a fully developed record."  *Id.* at 740.  As explained, the Sixth Circuit did not have those advantages in this case.

at 56.]  Because of the nature of protests, participants might be more likely to contract coronavirus during a protest than they are in a restaurant operating at 33% capacity.  But it is the right to protest—through the freedom of speech and freedom of assembly clauses— that is constitutionally protected, not the right to dine out, work in an office setting, or attend an auction.  Kentucky must do better than prohibiting large gatherings for protest outright.

As it currently stands, the state is enjoined from prohibiting drive-through protests, provided those participating practice social distancing.  [R. 29 at 6.]  With this Order, they are also enjoined from enforcing the prohibition on mass gatherings as it relates to in-person, political protests.  Now, using the tools available, Defendants must amend the Mass Gatherings Order to allow for both drive-through and in-person protests in a manner consistent with the medical and scientific realities, while bearing in mind the constitutional protections accorded such behavior.  The Court expressly declines to opine on what such an Order might include.

As the Sixth Circuit recognized before remand, the panel had "no way to determine what the facts are concerning a prohibition on in-person protests and whether there are features of large in-person protests that distinguish them from other mass gatherings[.]"  [R. 31 at 1.]  With the deposition testimony of Dr. Stack, this Court has the benefit of more facts than were available to the Sixth Circuit.  And their Order granting injunction pending appeal hinted that more flexibility in the context of in-person protests might be constitutionally required.  That is precisely the type of policymaking best left to Defendants, and they are ordered to engage in it. In the case of political protests, it is suspect that a generally applicable ban of groups larger than ten—or fifty, beginning June 29—is narrowly tailored, when nothing but the size of the gathering is taken into consideration.  Defendants must devise a way to utilize mitigation measures such as social distancing, mask wearing, handwashing, and a recommendation for

21

outdoor over indoor events—as they have done in other contexts— that more liberally allows gathering for the purpose of protest. Nevertheless, it is not the role of the Court to dictate the exact restrictions to be put in place. Defendants have managed to make the necessary adjustments as it concerns other constitutionally protected activities, and the Court is confident they can do so here. As written, the Order is not narrowly-tailored, and the blanket ban on mass gatherings must fail.[10]

c

In reaching this conclusion, the Court is cognizant of the rule espoused in *Jacobson v. Massachusetts* and Chief Justice Roberts' reasoning in his concurring opinion in *South Bay. See supra* section II.A. In *Jacobson*, the Supreme Court considered whether, when faced with an outbreak of smallpox, the city of Cambridge could constitutionally require its adult residents to receive vaccinations against the disease. *See Jacobsen*, 197 U.S. at 25–26. Those who refused to vaccinate were subjected to a fine. *Id.* at 26. Although the defendant argued the law was an invasion of his liberty and violative of due process, the Supreme Court upheld the vaccination requirement based on public health concerns. *Id.* at 39.

Thus, *Jacobson* allows states considerable leeway in enacting public health measures during a public health emergency, provided "the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *In re Abbott*, 954 F.3d 772, 784–85 (5th Cir. 2020)

---

[10] The Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits. The likelihood of success on the merits is largely determinative in constitutional challenges like this one, however, the remaining factors also mitigate in favor of Plaintiffs. The Supreme Court has held "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). No harm will come to Defendants if they are enjoined from enforcing the existing Order, which they have repeatedly stated they will not enforce. Finally, the public interest favors enjoinment of a constitutional violation. *See Martin-Marietta Corp v. Bendix Corp.*, 60 F.2d 558 568 (6th Cir. 1982).

22

(citing *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31 (1905)).  Under *Jacobson*, courts are to be circumspect second-guessing the policy decisions of public officials responding to a public health emergency.  *See id.*

Justice Roberts echoed that sentiment, recognizing, "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement."  *South Bay United Pentecostal Church v. Newson*, 140 S. Ct. 1613.  Therefore, public officials should be afforded wide latitude "to act in areas fraught with medical and scientific uncertainties."  *Id.*  Justice Roberts goes on to say that "[w]here those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."  *Id.*

Defendants argue that *Jacobson* and Justice Roberts' concurrence in *South Bay* "decisively resolve[] this case."  [R. 36 at 2.]  Defendants contend they have not exceeded the "broad limits" of *Jacobson*, and therefore this Court should not "engage in an impermissible second-guessing of the Mass Gatherings Order[.]"  *Id.* at 5.  Further, Defendants read Justice Roberts' opinion in *South Bay* as "expressly forbid[ding] this sort of probing review" into the facts underlying Defendants' policy decisions undertaken through the deposition of Dr. Stack. *Id.* at 6.

The Court has already addressed what it thinks is the precedential value of Justice Roberts' concurrence in *South Bay*.  *Supra* section II.A.  And while courts should refrain from second-guessing the efficacy of a state's chosen protective measures, "an acknowledged power of a local community to protect itself against an epidemic . . . might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to

interfere[.]"  *Jacobson*, 197 U.S at 28.  "[E]ven under *Jacobson*, constitutional rights still exist."
*On Fire Christian Ctr.*, 2020 U.S. Dist. LEXIS 65924, at * 15.  There is a difference between
second-guessing the efficacy of instituting a Mass Gatherings Order in the first instance—which
the Court does not do—and requiring the Governor to use his discretion to craft an Order that
does not completely eliminate Kentuckians' ability to gather for in-person exercise of their First
Amendment rights.  The Court does the latter.

### III

If you think about it, the very nature of a pandemic threatens our liberty in every
conceivable way.  A perfect response would require everyone to stay put and limit contact with
everyone else.  But that is not the world we live in.

Policy makers are necessarily balancing interests.  And courts should give them
deference to do this difficult and important task.  While that deference may be robust in a time of
crisis it is not absolute.  The Governor has gone too far here.  The Motion for a Preliminary
Injunction [R. 6] will be **GRANTED**.

This the 24th day of June, 2020.

Gregory F. Van Tatenhove
United States District Judge